Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
BRODSKY & SMITH, LLC
9595 Wilshire Blvd., Ste. 900
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS SHUDIC, Individually and On Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | CLASS ACTION COMPLAINT FOR: |
| THE HABIT RESTAURANTS, INC., CHRISTOPHER K. REILLY, ALLAN W. KARP, IRA ZECHER, A. WILLIAM ALLEN III, RUSSELL W. BENDEL, IRA FILS, JOSEPH J. KADOW, KARIN TIMPONE, | (1) Breach of Fiduciary Duties<br>(2) Aiding and Abetting Breach of Fiduciary Duties<br>(3) Violation of § 14(a) of the Securities Exchange Act of 1934<br>(4) Violation of § 20(a) of the Securities Exchange Act of 1934 |
| Defendants. | DEMAND FOR JURY TRIAL |

Plaintiff Thomas Shudic ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his undersigned counsel, alleges the following upon information and belief, including the investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of himself and all other similarly situated public stockholders of The Habit Restaurants, Inc. ("Habit Restaurants" or the "Company") against Habit Restaurants' Board of Directors (the "Board" or the "Individual

Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and for breaches of fiduciary duties in connection with the proposed acquisition by YUM! Brands, Inc. ("Parent"), and YEB Newco Inc., a wholly owned subsidiary of Parent ("Merger Sub," and with Parent, "Yum! Brands"), whereby Merger Sub will merge with and into Habit Restaurants, with Habit Restaurants continuing as the surviving corporation and as a wholly-owned subsidiary of Parent.

2.      Headquartered in Irvine, California, Habit Restaurants operates and franchises fast casual restaurants under The Habit Burger Grill name. It specializes in offering made-to-order char-grilled burgers and sandwiches featuring choice tri-tip steak, grilled chicken, and sushi-grade tuna cooked over an open flame; and salads, as well as sides, shakes, and malts. As of February 28, 2019, the company had 250 restaurants in California, Arizona, Utah, New Jersey, Florida, Idaho, Virginia, Nevada, Washington, Maryland, and Pennsylvania, as well as 4 international locations.

3.      On January 6, 2020, the Company announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Parent will acquire Parent will acquire Habit Restaurants, with Merger Sub merging with and into Habit Restaurants, and Habit Restaurants surviving as a wholly owned subsidiary of Parent (the "Merger"). The transaction consideration is $14.00 per share (the "Proposed Transaction").

4.      Thereafter on February 4, 2020, Habit Restaurants filed a Preliminary Proxy Statement on Schedule 14A (the "Preliminary Proxy") with the United States Securities and Exchange Commission (the "SEC") in support of the Proposed Transaction.  Notably, the Preliminary Proxy is wholly insufficient and provides either materially misleading and or insufficient information for Habit Restaurants stockholders to properly analyze whether to tender their shares in favor of the Proposed Transaction, and is therefore a continuation of the Board's breaches of fiduciary duty.

5.      The Proposed Transaction is unfair and undervalued for a number of reasons. Significantly, the Preliminary Proxy describes an insufficient sales process in which the Board

only paid lip service to its fiduciary duties.

6.      In addition to Yum! Brands' interest in the Proposed Transaction, the deal may also be tainted by conflicts of interest of the directors and Company executives.  Notably, certain of the Company's directors and senior executive officers may have been motivated to enter into the Proposed Transaction in order to receive benefits not shared equally with Plaintiff and members of the Class (defined below).  Under the terms of the Merger Agreement, all illiquid Company options and other incentive awards will vest no later than seven days before the effective date of the Proposed Transaction.

7.      Finally, in violation of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and their fiduciary duties, Defendants caused to be filed the materially deficient Preliminary Proxy with the SEC in an effort to solicit stockholders to tender their Habit Restaurants shares in favor of the Proposed Transaction.  The Preliminary Proxy is materially deficient and deprives Habit Restaurants stockholders of the information they need to make an intelligent, informed and rational decision of whether to tender their shares in favor of the Proposed Transaction.  As detailed below, the Preliminary Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process leading up to the Proposed Transaction; (b) failing to provide certain of the Company's financial projections; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the "Financial Advisor" to the Board, Piper Sandler & Co. (formerly known as Piper Jaffray & Co.) ("Piper Sandler").

8.      If the Proposed Transaction is approved, the Individual Defendants will have breached their fiduciary duties of loyalty and due care by, *inter alia*, agreeing to sell Instructure without first taking steps to ensure that Plaintiff and Class members (defined below), who are the minority stockholders of the Company, would obtain adequate and fair consideration under the circumstances.

9.      Absent judicial intervention, the Merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  For these reasons and as set forth in detail herein,

Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of their fiduciary duties. Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## THE PARTIES

10.    Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Habit Restaurants common stock.

11.    Defendant Habit Restaurants is a Delaware corporation with its executive offices located at 7320 Red Hill Avenue, Suite 140, Irvine, CA 92614.  Habit Restaurants operates and franchises fast casual restaurants in North America. The company trades on the NYSE under the ticker symbol "HABT."

12.    Defendant Russell W. Bendell ("Bendell") has served on the Board of Company at all relevant times. Bendell also has served as the Company's President and Chief Executive Officer since August 2014.

13.    Defendant Christopher K. Reilly ("Reilly") has served on the Board of Company at all relevant times.  Reilly also serves as the Chairperson of the Nominating and Corporate Governance Committee.

14.    Defendant Allan W. Karp ("Karp") has served on the Board of Company at all relevant times. Timpone also serves as a member of the Compensation Committee.

15.    Defendant Ira Zecher ("Zecher") has served on the Board of Company at all relevant times. Zecher also serves as the Chairperson of the Audit Committee and is a member of the Nominating and Corporate Governance Committee.

16.    Defendant A. William Allen III ("Allen") has served on the Board of Company at all relevant times. Allen also serves as the Chairperson of the Compensation Committee and is a member of the Audit Committee.

17.    Defendant Ira Fils ("Fils") has served on the Board of Company at all relevant times. Fils has served as the Company's Chief Financial Officer and Secretary since August 2014.

18.     Defendant Joseph J. Kadow ("Kadow") has served on the Board of Company at all relevant times. Timpone also serves as a member of the Audit and Nominating and Corporate Governance Committees.

19.     Defendant Karin Timpone ("Timpone") has served on the Board of Company at all relevant times. Timpone also serves as a member of the Compensation and Nominating and Corporate Governance Committees.

20.     Defendants identified in paragraphs 9 through 16, *supra*, are referred to herein as the "Board" or the "Individual Defendants."

21.     Non-Defendant Yum! Brands, Inc. is headquartered in Louisville, Kentucky, and together with its subsidiaries, develops, operates, and franchises quick service restaurants worldwide. It operates in three segments: the KFC Division, the Pizza Hut Division, and the Taco Bell Division. The company operates restaurants under the KFC, Pizza Hut, and Taco Bell brands, which specialize in chicken, pizza, and Mexican-style food categories.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

23.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Instructure is incorporated in this District, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Instructure common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

26.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of October 28, 2019, there were more than approximately 26 million shares of Habit Restaurants common stock issued and outstanding. The actual number of public stockholders of Habit Restaurants will be ascertained through discovery;

(b)     There are questions of law and fact which are common to the Class, including *inter alia*, the following:

i.     whether the Individual Defendants have violated the federal securities laws and/or breached their fiduciary duties of undivided loyalty, independence or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

ii.     whether defendants are engaging in self-dealing in connection with the Proposed Transaction;

iii.     whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

iv.     whether defendants are unjustly enriching themselves and other insiders or affiliates of Habit Restaurants and/or Parent;

v.     whether the Individual Defendants have breached any of their fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, candor, and fair dealing;

vi.     whether the defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

CLASS ACTION COMPLAINT

vii.        whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction complained of herein consummated.

(c)        Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

(d)        Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)        The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(f)        Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

(g)        Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

27.        Founded in 1969, Habit Restaurants operates and franchises fast casual restaurants under The Habit Burger Grill name. As of May 1, 2019, the Company had 255 restaurants in California, Arizona, Utah, New Jersey, Florida, Idaho, Virginia, Nevada, Washington, Maryland, and Pennsylvania, as well as 5 international locations.

28.        The Company had performed well financially before the merger announcement. On September 24, 2019, the Company released its Fiscal 2019 Third Quarter results, noting a spike of 12.1% in Total Revenue and an increase of 3.1% in sales in comparison to the same quarter in 2018. Additionally, adjusted net income in the fiscal 2019 third quarter was $1.0 million, or $0.05 per diluted weighted average share, compared to net loss of $0.6 million, or $(0.03) per

diluted weighted average share, in the third quarter of 2018. Adjusted EBITDA in the fiscal 2019 third quarter was $10.6 million, compared to $9.6 million for the third quarter of 2018.

29.     Defendant Bendell stated in part, "We're pleased to report strong results this quarter, which included our sixth consecutive quarter of company-operated comparable restaurant sales growth, at 3.1%.  We also continued to make progress on our mission to be a total access brand to our customers. Our total number of drive-thrus reached 51 during the quarter, we also installed self-ordering kiosks in our 20th restaurant, and saw our mobile app downloads and usage increase dramatically in the third quarter."

30.     In the same press release regarding its fiscal 2019 third quarter financial results, on October 30, 2019, Defendant Bendell, underlining Habit Restaurant's bright outlook for the upcoming year, stated, "For 2020 we expect to open a total of 29 to 35 locations, which would include 12 to 15 franchise locations, more than doubling our expected franchise openings in 2019."

31.     In the Company's third quarter earnings conference call, Defendant Bendell spoke more about the future of the Company:

> We continued to make progress on our mission to be a total access brand to our customers in this ever-changing consumer environment. Our off-premise business continued to grow during the quarter, allowing our guests to enjoy Habit's great food without leaving the comfort of their home or office.
>
> We are very pleased with the trajectory of the delivery channel, and it has quickly grown to be a meaningful part of our business. In addition to delivery, our sales through our current online ordering platform and mobile channels continue to experience significant growth, with same-store sales through this channel up 25.8% during the third quarter. We executed a systemwide soft rollout of our new mobile app in mid-July, making it even easier for customers to order ahead, and skip the line in-store.
>
> With a little marketing support, we have quickly seen over 100,000 guests download our app. We plan on putting marketing support behind the mobile app in Q4 of this year. Speaking of the in-store experience, we now have self-order kiosks installed in 20 of our restaurants, allowing customers a different and faster way to order

CLASS ACTION COMPLAINT

in-store. On average, we're finding that over 8% of our sales are coming through the kiosks at these locations.

32.     In addition, the Company has publicly eyed international expansion since an October 9, 2019 press release where Company's Global Partnership Officer John Phillips expressed interest in South Korea. Phillips stated "South Korea, with its savvy consumers, open minded culture and interest in global brands is an ideal marketplace for The Habit Burger Grill's expansion... The people of South Korea appreciate quality food and enjoy the fast-casual experience. We look forward to working with Bridging Culture Worldwide to find the right franchise partner to ensure our mutual success."

33.     Despite the financial strength of the Company, its position as a premier player in the industry, and the anticipated benefits of its recent financial performance, the Individual Defendants have entered into the Merger Agreement with Yum Brands!, allowing for the Company to be taken over and depriving Plaintiff and the public stockholders of the Company the opportunity to enjoy the upside of Habit Restaurants' continued success.

### The Proposed Transaction

34.     On January 6, 2020, a joint press release announced the Proposed Transaction, stating, in relevant part:

> Louisville, KY and Irvine, CA, January 6, 2020 – Yum! Brands, Inc. (NYSE: YUM) and The Habit Restaurants, Inc. (NASDAQ: HABT) ("The Habit Burger Grill") today announced that they have entered into a definitive agreement pursuant to which Yum! Brands will acquire all of the issued and outstanding common shares of The Habit Burger Grill for $14 per share in cash or a total of approximately $375 million. The board of directors of The Habit Burger Grill, acting on the recommendation of a special committee composed of non-executive independent directors, has unanimously approved the transaction.
>
> The acquisition of The Habit Burger Grill will add an award-winning fast-casual concept with a loyal fan-base to Yum! Brands, the world's largest restaurant company in terms of units and parent of the KFC, Pizza Hut and Taco Bell global brands. Founded in California in 1969, The Habit Burger Grill offers a flavor-forward variety of made-to-order items uniquely chargrilled over an open flame. Fan favorites include charburgers, hand-filleted and marinated chargrilled chicken sandwiches, sushi-grade chargrilled

- 9 -

ahi tuna sandwiches, fresh salads, craveable sides and handmade frozen treats. The Habit Burger Grill, named Best Regional Fast Food in USA Today's 2019 Best Readers' Choice Awards, operates nearly 300 company-owned and franchised restaurants across the U.S. and in China.

David Gibbs, Chief Executive Officer of Yum! Brands, said, "We've emerged from our three-year transformation stronger and in a better position accelerate the growth of our existing brands and leverage our scale to unlock value from strategic acquisitions."

Gibbs continued, "As a fast-casual concept with strong unit economics, The Habit Burger Grill is a fantastic addition to the Yum! family and has significant untapped growth potential in the U.S. and internationally. With its delicious burgers and fresh proteins chargrilled over an open flame, The Habit Burger Grill offers consumers a diverse, California-style menu with premium ingredients at a QSR-like value. The transaction is a win-win because it allows us to offer an exciting new investment to our franchisees and to expand an award-winning, trend-forward brand through the power of Yum!'s unmatched scale and strengths in franchising, purchasing and brand-building."

Yum! Brands estimates minimal impact to non-GAAP earnings per share before special items in 2020, with accretion beginning in 2021 and increasing thereafter.

Russell Bendel, President and Chief Executive Officer of The Habit Burger Grill, said, "Over the past few years, we've focused on becoming a total access brand by growing our delivery business, expanding our online ordering and mobile channels and enhancing the in-store experience by introducing drive-thrus, kiosks and technology-centric solutions for operations. We're proud these and other actions have made The Habit Burger Grill an attractive candidate for a transaction of this kind. On behalf of The Habit Burger Grill Board of Directors, this transaction represents an exciting new chapter to strengthen and significantly grow The Habit Burger Grill by leveraging Yum! Brands' global scale, resources and franchising capabilities. We're confident the agreement delivers immediate value to The Habit Burger Grill shareholders and will greatly benefit our beloved brand, team members, franchisees and loyal guests for many years to come."

**The Habit Burger Grill Highlights**

***Customer experience of quality, hospitality, convenience and QSR-like value***. The Habit Burger Grill is focused on delivering a unique customer experience, served up by talented team members and underpinned by outstanding operations capabilities. The brand pairs

the premium quality and hospitality consumers associate with full-service and fast-casual chains with the strengths in value, convenience and digital access of quick-service restaurants.

*Diverse, grill-focused and California-style menu*. It offers customers a diverse menu featuring a distinctive chargrilled preparation technique to deliver an appealing variety of burgers, chicken, tuna and steak featured in its sandwiches and salads, which are made-to-order using fresh ingredients.

*Modern asset strategy to drive traffic*. The Habit Burger Grill believes its investment in contemporary restaurant design – featuring open kitchens, outdoor patios and interiors enhanced with natural light, polished stone and hardwood accents – has contributed to its balanced day part mix of approximately 50 percent lunch and 50 percent dinner.

*Expanding digital and delivery capabilities*. Over the past couple of years, The Habit Burger Grill has been enhancing the customer experience through delivery partnerships and by introducing online ordering, a mobile app, restaurant kiosks, drive-thrus and technology-centric solutions to deliver excellent store operations.

*Strong unit economics and growth.* From fiscal year 2009 to 2018, The Habit Burger Grill grew its company-operated restaurant average unit volumes (AUVs) by 49.9%, from approximately $1.2 million to $1.9 million, respectively. In the same time period, The Habit Burger Grill grew its total units at a 28.4% compound annual growth rate.

**Transaction Details**

Yum! Brands intends to fund the transaction using cash on hand and available borrowing capacity under its credit facilities.

The transaction is subject to approval by The Habit Burger Grill's stockholders, regulatory approval and other customary closing conditions. The transaction is expected to be completed by the end of the second quarter of 2020.

Following the closing of the transaction, The Habit Burger Grill will remain based in Irvine, Calif., and will continue to be managed by The Habit Burger Grill's President and CEO Russell Bendel and Chief Financial Officer Ira Fils. Mr. Bendel will report directly to David Gibbs.

BofA Securities, Inc. acted as financial advisor and Mayer Brown LLP acted as legal advisor to Yum! Brands. Piper Sandler Companies (formerly Piper Jaffray Companies) acted as financial

advisor and Ropes & Gray LLP acted as legal advisor to The Habit Burger Grill.

### *The Inadequate Merger Consideration*

35.     Significantly, analyst expectations, the Company's strong market position, extraordinary growth, and positive future outlook, establish the inadequacy of the merger consideration.

36.     For example, the merger consideration is below the Company's 52-week high of $14.16 and below what the stock was trading at as recently as late March 2019.

37.     The Company has reported six consecutive quarters of company-operated comparable restaurant sales growth, and has shown no signs of slowing down. The Company has supported an exciting new strategy with their recent investment in delivery and online customer interaction, likely resulting in continued future financial success.

38.     Importantly, the Offer Price fails to adequately compensate Habit Restaurants' stockholders for the significant synergistic benefits that Parent will receive from the merger.

39.     After trading at their 52-week high in August of 2019, Parent's stock price has been on the decline, resulting in the pressure to expand their business strategy.

40.     Notably, in Parent's Q3 financial earnings conference call, David Gibbs, Yum Brands newly appointed CEO, said, "Now that we've got a better machine, we'd like to drive faster and grow faster … Now that we are more of a franchise, or less of an equity operator, that gives us the ability to turn our focus to leveraging the scale on behalf of the entire system … I do think that potentially could be something that would give us a benefit if we did an acquisition. We don't need acquisition to grow … but we certainly wouldn't rule out an acquisition."

41.     Regarding the benefits to the Parent in the Proposed Transaction, Forbes senior contributor Alicia Kelso said:

> The addition of The Habit Burger Grill makes plenty of sense on paper for Yum, further diversifying the restaurant giant's portfolio beyond its Taco Bell, KFC and Pizza Hut brands.

CLASS ACTION COMPLAINT

The Habit not only gives Yum a burger presence, which it hasn't had since it sold A&W in 2011, but also a solid footprint in the fast casual category, where it's been absent despite the segment's wild success. In 2018, the segment accounted for $42.2 billion in sales, and segment sales are expected to continue growing at a 7% clip throughout the next five years

42.     Similarly, after the deal was inked, an article in "The Motley Fool" noted, "Yum! is paying $14 per share, or approximately $375 million, a relative bargain considering that Habit debuted on the market at $18 per share in November 2014."

43.     In addition to the financial media's recognition of the partnership, in the January 6, 2020 press release regarding the Proposed Transaction, Yum Brands! CEO David Gibbs focused on Habit Restaurants' "significant untapped growth potential in the U.S. and internationally." This theory is not speculative, by reports of Habit Restaurant's eyeing of deals in South Korea as part of its broad Asia-Pacific region expansion.

44.     Yum Brands CEO David Gibbs has promoted the large, untapped potential of Habit internationally, The Motley Fool noted, "[e]xpect Yum! to leverage its marketing prowess and franchisee network to open up Habit locations in foreign markets, something Habit would have struggled to do on its own. Habit hopes to grow to more than 2,000 locations with Yum's help, according to The Wall Street Journal."

45.     Summing up, the Motley Fool article states, "At just $375 million for a critically acclaimed product line and a well-performing business, Habit seems to be a bargain for Yum! Brands. If the fast-food giant can expand the concept to 2,000 locations and open up international markets for Habit, there's little doubt that the deal will pay off over the long run."

46.     Moreover, with respect to synergies, Gibbs stated with respect to the deal, "We think, given our scale and our capabilities, they match up with Habit very well," "We should be able to unlock growth, give our franchisees a great new growth vehicle in the U.S. and, given our ability to take things to international markets, take this brand outside the U.S. in a bigger way than we have already." "We really like the risk-reward in terms of the size of what we have paid to get something with the potential that this has."

- 13 -

47.     Accordingly, the sale of the Company is being timed in an effort to curb any future increase in the share price of Habit Restaurants common stock, thus ensuring that Yum Brands! can effectuate its takeover on the cheap.  Having failed to maximize the sale price for the Company, the Individual Defendants breached the fiduciary duties they owe to the Company's public stockholders because the Company has been improperly valued and public stockholders will not receive adequate or fair value for their Habit Restaurants common stock.

***Preclusive Deal Mechanisms***

48.     The Merger Agreement contains certain provisions that unduly benefit Menlo by making an alternative transaction either prohibitively expensive or otherwise impossible. Significantly, the Merger Agreement contains a termination fee provision that is especially onerous and impermissible.  Notably, in the event of termination, the merger agreement requires Company to pay up to $13,125,000, if the Merger Agreement is terminated under certain circumstances. Moreover, under one circumstance, each must pay this termination fee even if it consummates any competing Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  The termination fee will make the Company that much more expensive to acquire for potential purchasers.  The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

49.     The Merger Agreement also contains a "No Solicitation" provision that restricts Habit Restaurants from considering alternative acquisition proposals by, *inter alia*, constraining Habit Restaurants ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the provision prohibits either Habit Restaurants from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide *"Acquisition Proposal"* if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

50.     Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, the Individual Defendants agreed to provide Yum! Brands information in order to match any other offer, thus providing the other access to the unsolicited

bidder's financial information and giving the other the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Yum! Brands.

51.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

52.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

### *Potential Conflicts of Interest*

53.     The breakdown of the benefits of the deal indicate that Habit Restaurants insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Habit Restaurants.

54.     Certain insiders stand to receive financial benefits as a result of the Proposed Transaction.  Notably, Company insiders, including the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for large cash pay days upon the consummation of the Proposed Transaction. Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option, restricted share, LLC Unit, and/or RSU will be canceled and converted into the right to receive cash considerations, as follows  Members of the Company Board and Management will be compensated for their large shares of Company stock and their company options and restricted awards as follows:

| Name of Executive Officer or Director | Number of Shares of Class A Common Stock (#) | Number of Shares of Class B Common Stock / LLC Units (#) | Cash Consideration for Common Stock/ LLC Units ($) |
|---|---|---|---|
| A. William Allen III | 18,561 | — | 259,854 |
| Joseph J. Kadow | 5,894 | — | 82,516 |
| Allan Karp | 230,043 | 2,554,681 | 38,986,136 |
| Christopher Reilly | 230,043 | 2,554,681 | 38,986,136 |
| Karin Timpone | 1,139 | — | 15,946 |
| Ira L. Zecher | 894 | — | 12,516 |
| Russell W. Bendel | 30,821 | 718,958 | 10,496,906 |

CLASS ACTION COMPLAINT

| | | | |
|---|---|---|---|
| Ira Fils | 21,315 | 263,553 | 3,988,152 |
| Anthony Serritella | 13,873 | 276,576 | 4,066,286 |
| Iwona Alter | 3,925 | — | 54,950 |
| Douglas R. Branigan | 700 | — | 9,800 |
| John Phillips | 3,616 | 34,373 | 531,846 |
| Peter Whitwell | 8,093 | 38,431 | 651,336 |

55.     Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option or equity award, will be canceled and converted into the right to receive certain consideration according to the merger agreement.

56.     Moreover, Further, certain members of management, including Defendant Truitt, are eligible for "golden parachute" payments as part of the merger-related consideration, as follows:

| Name | Cash ($) [1] | Equity ($) [2] | Perquisites/ Benefits ($) [3] | Total ($) [4] |
|---|---|---|---|---|
| Russell W. Bendel | 1,565,600 | 1,346,836 | 28,800 | 2,941,236 |
| Ira Fils | 881,100 | 983,064 | 28,800 | 1,892,964 |
| Anthony Serritella | 539,019 | 677,686 | 19,200 | 1,235,905 |

57.     Finally, certain directors and officers, including defendants Reilly and Karp, will receive aggregate payments of over $23 million as part of a Tax Receivable Agreement ("TRA") that exists in connection with the initial public offering of shares of Class A common stock and represents significant payments to these individual/entities that are not available to the Company's shareholders.  A that time, the Company entered into the TRA with certain owners of equity interests of Habit LLC as of immediately prior to such initial public offering. The TRA provided for certain payments to such equityholders and their assignees by the Company with respect to certain tax attributes of the Company, including in connection with a change of control of the Company. On January 5, 2020, in connection with the execution of the Merger Agreement, the Company entered into the TRA Amendment with Habit LLC and the TRA Holders to amend the TRA. The payments are as follows:

| Name of Executive Officer or Director | TRA Amendment Payment ($) |
|---|---|
| A. William Allen III | — |
| Joseph J. Kadow | — |
| Allan Karp[1] | 17,472,535 |
| Christopher Reilly[1] | 17,472,535 |
| Karin Timpone | — |

CLASS ACTION COMPLAINT

| | |
|---|---|
| Ira L. Zecher | — |
| Russell W. Bendel | 2,637,036 |
| Ira Fils | 922,051 |
| Anthony Serritella | 910,018 |
| Iwona Alter | — |
| Douglas Branigan | — |
| John Phillips | 124,944 |
| Peter Whitwell | 228,651 |
| All executive officers and directors as a group (13 persons) | 22,295,235 |

58.     Thus, while the Proposed Transaction is not in the best interests of Habit Restaurants stockholders, it will produce lucrative benefits for the Company's officers and directors.

### *The Materially Misleading and/or Incomplete Preliminary Proxy*

59.     On February 4, 2020, Defendants caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning Habit Restaurants' Projections*

60.     The Preliminary Proxy fails to provide information concerning financial projections provided by Habit Restaurants' management and relied upon by Piper Sandler in its analyses.  The Preliminary Proxy discloses management-prepared financial projections for the Company which are materially misleading.  The Preliminary Proxy indicates that in connection with the rendering of Piper Sandler's fairness opinion, Piper Sandler "reviewed and analyzed certain information furnished to Piper Sandler by Company management relating to the business, operations, and prospects of the Company, including the Company Projections."

61.     Accordingly, the Preliminary Proxy should have, but fails to provide, information from the projections that Habit Restaurants management provided to the Board and Piper Sandler. Courts have uniformly stated that "projections . . . are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or []

market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201–03 (Del. Ch. 2007).

62.     Specifically, the Preliminary Proxy fails to for each set of projections, provide the line items used to calculate (i) Adjusted Total Revenue, (ii) Adjusted Restaurant Operating Costs, (iii) Adjusted General and Administrative Costs, (iv) Pre-Opening Costs.

63.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

64.     Without accurate projection data presented in the Preliminary Proxy, Plaintiff and other stockholders of Habit Restaurants are unable to properly evaluate the Company's true worth, the accuracy of Piper Sandler' financial analyses, or make an informed decision whether to tender their Company stock in favor of the Proposed Transaction.  As such, the Board has breached its fiduciary duties by failing to include such information in the Preliminary Proxy.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Piper Sandler*

65.     In the Preliminary Proxy, Sandler Piper describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

66.     With respect to the *Discounted Cash Flow Analysis*, the Preliminary Proxy fails to disclose the following:

a.   The specific inputs and assumptions used to calculate the discount rate range of 10.9%-15.9%;

b.   The basis for the application of EBITDA multiples ranging from 7.6x to 9.6x;

CLASS ACTION COMPLAINT

  c. The terminal value for Habit Restaurants;

  d. The Company's non-TRA related net operating loss ("NOL") balance;

  e. Net debt of the Company as of December 31, 2019; and

  f. The Company's portion of the tax benefits from the Umbrella Partnership C-Corporation ("Up-C") structure at fiscal year-end 2023.

67. With respect to the *Selected Companies Analysis*, the Preliminary Proxy fails to disclose the actual individual multiples and metrics for the companies set forth in the analysis.

68. With respect to the *Selected Precedent Transactions Analysis*, the Preliminary Proxy fails to disclose the actual individual multiples and metrics for the transactions set forth in the analysis.

69. With respect to the *Premiums Paid Analysis*, the Preliminary Proxy fails to disclose the actual premium for each of the analyzed transactions.

70. These disclosures are critical for stockholders to be able to make an informed decision on whether to tender their shares in favor of the Proposed Transaction.

### COUNT I

### Breach of Fiduciary Duties

### (Against All Individual Defendants)

71. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

72. The Individual Defendants have violated fiduciary duties of care, loyalty, independence, candor, fair dealing and good faith owed to the public stockholders of Habit Restaurants.

73. By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Habit Restaurants.

74. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith and independence owed

to the stockholders of Habit Restaurants because, among other reasons, they failed to take reasonable steps to obtain and/or ensure that Habit Restaurants stockholders receive adequate and fair value for their shares.

75.     The Individual Defendants have also caused materially misleading and incomplete information to be disseminated to the Company's public stockholders.  The Individual Defendants have an obligation to be complete and accurate in their disclosures.

76.     The misleading omissions and disclosures by defendants concerning the background leading to the Proposed Transaction and information and analyses presented to and considered by the Board and its advisors affirm the inadequacy of disclosures to the Company's stockholders.  Because of defendants' failure to provide full and fair disclosure, Plaintiff and the Class will be stripped of their ability to make an informed decision with respect to the Proposed Transaction, and thus are damaged thereby.

77.     The Individual Defendants dominate and control the business and corporate affairs of Habit Restaurants both through their positions within the Company and on the Board, and are in possession of private corporate information concerning Habit Restaurants assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Habit Restaurants which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

78.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

79.     As a result of the actions of defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Habit Restaurants' assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

80.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable

harm of the members of the Class.

81.     Plaintiff and the members of the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## SECOND COUNT
### Aiding and Abetting the Board's Breaches of Fiduciary Duty
### <u>(Against The Habit Restaurants)</u>

82.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

83.     Habit Restaurants knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.  In connection with discussions regarding the Proposed Transaction, A Habit Restaurants secured certain deal protection provisions which unfairly inhibit the advancement of alternative proposals.  In addition, Habit Restaurants obtained sensitive non-public information concerning Habit Restaurants' operations and thus had the advantage to acquire the Company at a price that is unfair to plaintiff and the Class.

84.     As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

85.     Plaintiff and the members of the Class have no adequate remedy at law.

### THIRD COUNT

### Violations of Section 14(a) of the Exchange Act
### (Against All Defendants)

86.     Plaintiff incorporates each and every allegation set forth above as if set forth in full herein.

87.     Defendants have disseminated the Preliminary Proxy with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

88.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

89.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

90.     The Proxy was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

91.     The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

92.     The Individual Defendants were at least negligent in filing a Proxy that was materially misleading and/or omitted material facts necessary to make the Proxy not misleading.

93.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to decide whether to vote their shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## FOURTH COUNT

### Violations of Section 20(a) of the Exchange Act
### (Against The Individual Defendants)

94.     Plaintiff incorporates each and every allegation set forth above as if set forth in full herein.

95.     The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Proxy was materially misleading to Company stockholders.

96.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Proxy and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Proxy.  The Individual Defendants were provided with

copies of, reviewed and approved, and/or signed the Proxy before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

97.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Instructure's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Proxy was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Proxy and are therefore responsible and liable for the misrepresentations contained herein.

98.     The Individual Defendants acted as controlling persons of Instructure within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Instructure to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Instructure and all of its employees.  As alleged above, Instructure is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9.  By reason of their conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as Class representative;

B.     Declaring that the Individual Defendants have breached their fiduciary duties to Plaintiff and the Class;

C.     Declaring that the Merger Agreement was entered into in breach of the Individual

1  Defendants' fiduciary duties and is therefore unlawful and unenforceable;

2          D.      Preliminarily and permanently enjoining defendants and all those acting in concert

3  with them from consummating the Proposed Transaction until such time that the Individual

4  Defendants have adequately undertaken all appropriate and available methods to obtain a

5  transaction which is in the best interests of Habit Restaurants' stockholders, make full and fair

6  disclosure to Habit Restaurants stockholders and remove any conflict of interest that has clouded

7  the process and the Individual Defendants' judgment;

8          E.      In the event that the Proposed Transaction is consummated, rescinding the merger,

9  and awarding Plaintiff and the Class compensatory damages and rescissory damages;

10         F.      Awarding Plaintiff the costs and disbursements of this action, including a

11 reasonable allowance for Plaintiff's attorneys' fees, expenses and experts' fees; and

12         G.      Granting such other and further relief as this Court may deem to be just and proper.

**JURY DEMAND**

14  Plaintiff demands a trial by jury.

Dated: February 13, 2020                    **BRODSKY & SMITH, LLC**

By: _____
Evan J. Smith (SBN242352)
Ryan P. Cardona (SBN302113)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone:(877) 534-2590
Facsimile: (310) 247-0160
esmith@brodskysmith.com
rcardona@brodskysmith.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT